Mr. Proctor. Thank you. We're ready when you are, sir. And on behalf of Mr. Nelstein and I, we'd both like to thank you for keeping the best to last, Your Honor. I represent Jean Brown. I represent her trial below, and I'm here today to argue. There are three issues in the brief. The third one, which is the what the appellant would call the apprendee violation. I plan to spend no time on it. It's readily apparent from the record. I don't believe arguing it. Which leaves the last two, and I guess I want to start off by saying the two are not mutually exclusive. The statement of Ms. Brown was procured without the benefit of an attorney, and then played for the jury without the benefit of a judge. I want to spend the majority of my time, and of course, if the Court has any questions, I'll be happy to segue in a different direction. She had an attorney who took her up there to Maryland and made a deal, and she pled guilty. And then they agreed to cooperate, and he told her to go talk to the FBI and tell them the truth. And absented himself. And she talked to the FBI. Absented himself from the proceedings. And he went home to Florida. I mean, those are the facts we have. But he was handpicked by her, or paid by her, presumably, and was a representative at the time she was talking to the FBI. So she had counsel. He was paid by a co-conspirator, but that's another story. But that's not in the record, is it? I believe Mr. Cutrone, the attorney, was purposely vague about who paid him. He didn't recall. If I get a check, I always know who it came from, but that's another story. But in particular, what I wanted to focus on is the judge absenting himself from the proceedings. The judge, not the lawyer. I'm happy to talk about that. But you briefed the lawyer a lot. I did. And maybe his conduct wasn't the best of the world. It probably wasn't. But he was her lawyer, and he advised her to talk and tell the truth, and they went forward on that basis. She advised her to plead guilty, and she did. And part of the deal, she was supposed to tell the truth, and that was going to be taken into account, I presume, with sentencing. I think it was under the plea agreement. In a case with a five-year statutory maximum. In a case with a five-year statutory maximum. And then she ends up with another indictment. And that's when you have this trial. And that's when you get in the case. And talk for 11 hours to seasoned homicide prosecutors without her lawyer being there. A lot of lawyers wouldn't have done that. But they did it, and he was retained. Yes, sir. But be that as it may, you know, I believe Judge Quarles's absence while the jury in. You say that's structural error. Structural error, sir. And would you agree that it's plain error review? No. Because it's structural error. Is that the reason you say it's not plain error review? It wasn't objected to. It was objected to. It was not objected to. They made a motion after the thing was played when he came back in the courtroom. What else was I supposed to do? There was no judge in the courtroom. Well, you've got to get up there and say, don't leave, judge. You can't leave. Well, I . . . You made a motion after the thing was over with. You can't mousetrap the trial judge by waiting until something happens. And then saying that was wrong, you've got to try to head it off. You've got to give a judge a chance to rule on it. As I put in the pleadings, you know, I'm kind of hamstrung by the record in this case. The U.S. Marshals Service watch, monitor events in real time, but they don't record it. So I had no way to show you what happened. But unlike this courtroom where you walk in that entrance and you walk off that entrance, Judge Quarles's door is right behind him. And my recollection is when he said, I'll be back, he had one foot at the door. There was no opportunity. There was no ability to address it. I thought he said, I'm going to leave, and if you need me . . . If you need me, the courtroom deputy will get me. At that point, even if he's gone, you would say, wait a minute, to the other side, I don't want to proceed. We need to get the judge back in here. And that time, the bailiff would go get the judge, and then you would make your objection. Well, of course . . . I mean, let's deal with the common sense. You're a trial lawyer, so you know what's happening here. I know what you feel. You feel like the judge is gone. And probably what happened, it just didn't occur to you right then, because you were probably in disbelief. The judge has left the courtroom, and you're kind of in shock. Whoa, what just happened? And then you start pulling, and all of a sudden, you may have this thought in your mind. But the law kind of holds you to do what you probably should do in a certain sense. Like that first, as Judge King says, Yonah, we would object to you leaving the court at that point. And it may have been awkward to do so, but he did say, come get me if you have some problems or something's going on, and he leaves. And then you don't say, I have some problems. You go on and let the jury hear this whole thing, and then we're kind of where we are. And the transcript says, counsel conferring, and Mr. Nelstein will argue . . . Well, maybe the most important part of this is this wasn't evidence being presented anyway. Well . . . The evidence had already been presented. This was during the jury deliberations, and they wanted to re-hear it, right? Well, I thought about that, Judge. Is that right? Sort of. Sort of, right. Short answer. The transcript site is page 395. And when the statement of the appellant was introduced, the government says, to be clear, we'll only be actually admitting the portions that will be playing in court. So it wasn't like, here's the disc. The jury could have listened to it back in the jury room 15 times. There would have been no harm. The whole disc was in. Segments of it were in. So it required teeing up and playing segment one, and then fast-forwarding it, because there were some . . . Is that the way it was done when the jury was listening to it in the judge's absence? The short answer is, I don't know. I was drafting a mistrial motion. Oh, you were writing a motion up. I wrote the motion and filed it. What else could I do with it? You didn't . . . Let me understand what you just said. You've got to stop the proceeding somewhere. You didn't listen to the proceeding while it was going on because you were writing a motion? I had co-counsel because it was a death-eligible case. I passed him with it. It's your job . . . Did anybody go knock on Judge Quarles' door? He was in another courtroom. Did anybody go in the other courtroom and say, we need you, you're trying to . . . No one did. . . . a criminal case. My client may be facing life in prison. We need you over there. No one did. Is it any indication that what was shown to them on the second time around was any different than what was shown the first time? Not as far as I believe. Any indication anything was done differently because the judge was not in that courtroom? Had he been there? Well, I mean, when that portion of the transcript ceased playing, everyone just . . . I mean, have you made any statements to this court to represent that? I mean, or is there anything there? I mean, did anybody make faces? Which I can see a reason a judge needs to be in there. He needs to control his courtroom. But did anybody do anything that would indicate some influence could have been made on that jury that otherwise wouldn't have been made had the judge been there? Well, the argument is . . . Have you alleged or stated any such thing? Yes. What is it? Again, to step back a moment, the most damning evidence against Appellant was her statement. It was the only thing asked for by the jury. But this is the same thing. You told me it's the same thing that was played to them the first time. Your question is . . . Your problem is not that it's being played to them. You've already said . . . I don't see anything saying if you play it, there's a problem. It's not a problem playing it. It's the identical thing, basically, that's been played to it. You don't know anything else. You're writing a motion. No one sees anything being done any different. The jury simply hears the same thing and they go back. Actually, an inference could be reasonably drawn if the judge didn't think much about what was being played, which inures to your benefit. Actually, no. I believe it inures to my detriment, and that's where I was about to go. The perception was Judge Quarles had heard enough. He'd made his mind up. He didn't need to hear this again. The opposite could also be a perception. Well, given that the government spent the majority of their time in closing talking about . . . And Ms. Brown's 11-hour . . . It doesn't make what the judge . . . whether the judge's mind was made up or not. He wasn't the finder of fact. It was the jury. What do you mean heard enough? He's already heard it in front of him. This is not additional evidence. This is the same thing he's heard. The only inference could be he's heard it before. He has a memory that's better than what the jury may have it, so he's gone out. When you look at the case law, the cases that weren't reversed, they talk about . . . The judge says, I'll be in chambers working on my jury instructions. And the courts, the Seventh Circuit and the Ninth, find it significant that no inference could be drawn from that. I'm working on jury instructions. I'm still a detached magistrate. That's where I'll be. Did either of them hold that it was structural error? Those cases didn't, in part because the judge explained where he would be and what he was doing, and he wasn't earshot. Again, there's no evidence on this one. One of them put his law clerk in charge, didn't he? One of them did, yes. Was that structural error? Yes, it was. It was reversed. At the bottom, what harm was done to your client? Structural error doesn't require harm, Judge Floyd is the first thing to say. They're necessarily unquantifiable. We'd be making new law in the Fourth Circuit if we were to determine that the judge's absence was structural error. I think you're going to be making new law either way. There's not a lot on this. I'm not sure we would. If there's no objection, we review it for plain error, right? If there's not a proper objection, we have to review this for plain error. Just assume for a minute, you don't give up the fact that you say you did what you could do. If you didn't preserve this properly, we review it for plain error. That means you have to meet some stringent standards. Correct. You've talked about it once this morning already. We've jumped around it here a lot. You have to meet the plain error standard. Right. The third prong would be the question that Judge Floyd directed to. How do you get past the third prong? The fundamental fairness? That has to be prejudicial. It does. You have to show prejudice. You have to show prejudice. It has to be error. It has to jump off the page and be plain. It has to be prejudicial, and then it has to affect . . . We have to agree to recognize it because it affects the integrity of the proceedings, perhaps. Yes, sir. To circle back from maybe where I started a few moments ago, this was the most damning evidence in the government's case, far and away. Ms. Bryan starts off by . . . But they'd already heard it. They had in the presence of a judge. This emphasizes it, you say. The judge leaving when this . . . And the jury didn't even ask for all of it. They asked for a specific portion, 35 minutes. Do you say they let them hear more than they asked for? No. You don't say that, okay. But when you got Ms. Bryan . . . The response to what the jury asked for was correct. As far as I know. Well, then we have to accept that it was correct because you don't say it was not correct. Correct. But when this damning evidence is being played, and it was the linchpin of the government's case, there were . . . We could agree with you. As I laid it out, we could agree that it's error for a judge to walk away and go to another court proceeding in another courtroom during the middle of a deliberation in a murder trial. That's not a murder trial, but it's almost a murder trial. Yeah. It's a trial where a defendant is going to get a life sentence or potentially for a murder in a drug transaction or drug transactions. That's something that probably shouldn't be done. It shouldn't be done. It's erroneous. The question is, even if we get past that point, how do you get any relief for your client? Right. And, you know, the case that you asked me about where the law clerk was presiding, there was obviously no . . . Whose circuit was that? That was, I think, Riley v. Deeds, and it was in Ninth Circuit. Ninth Circuit said the law clerk can't preside. Yeah. Correct. We might agree with that. I suspect we'd all agree that we don't want any law clerks presiding in trials that are going to expose somebody to a life sentence potentially. We don't want that. Well, here we had a . . . We're absolutely against that. Here we had a courtroom deputy. A law clerk has more legal training than a courtroom deputy. You know, so . . . Well, it shouldn't be done. It's error. It is. Then how is it plain error? What do you mean a courtroom deputy? Deputy clerk. You mean he's in charge when the judge left? I'm leaving. Belinda, who is the courtroom deputy, will get me if I'm needed. The deputy clerk. Deputy clerk. Well, how is that different from the other cases in the Fourth Circuit? You have cases in which the judges got up and left on closing an argument. We didn't find structural error in those. And the same thing. He told them in both instances, you can come get me if there's an objection by counsel. Who's coming to get him? I guess it's the clerk. Because the judge made it clear he would be an earshot. Which would indicate earshot meaning you can yell for me and come get me, not earshot I can hear what's going on. Well, actually, I think it was. I'll be in chambers. It's piped in. I'll hear what's going on. If there's an objection, I'll be ready. And the difference here is you're saying earshot is what you now hang on. Not the fact that the deputy clerk is in there. Well, then he asked for objections. And you didn't make any. If there's an objection, I'll be ready. The courtroom deputy will get me if I'm needed. That's not inviting an objection. Anything objectionable there. The only thing I heard you say was the problem that you have is that by the judge leaving, there's an inference that he is commenting on the evidence or commenting on the significance of it. Is that it? Or that he heard enough. Yes. You're not talking about this deputy clerk. Because this is not like the law clerk. The law clerk actually took control of the proceeding. And the court morale says you can't abdicate control to someone else. But the deputy in the courtroom is the same as the other cases in the full circuit. Whether in earshot or not, they go out and get you doing it. So as I understand it, the thing you're tying your ship to here has to do with that very narrow inference that by leaving, he's given an inference it's not worthy of hearing. It's not worthy of hearing or re-hearing. You pretty much said it's the same thing they heard before. Right. So it's not worthy for him to hear the same thing. How does that lead to it's not worthy for the jury to hear the same thing? Well, again, I keep coming back to this is the most damning evidence. If the judge had left for something benign, we want to see an exhibit sticker. We want to check the chain of custody log or something. I got nothing in all candor. But when you've got my client all but confessing to a murder and the judge leaves without giving any meaningful opportunity, I would submit to object or to have a hearing or to outline, Belinda will come get me? I don't even know what that means. We should stop talking in the middle of it? The jury should be sent back to retire until the judge comes in? Thank you. I've exhausted my time. Thank you. You have that other issue on the jury verdict. Yes. You didn't argue and maybe we'll ask him a couple questions. You can get back to that and reply if you want. I'd like that. Mr. Nostein. Yes. Good morning, Your Honors. My name is Peter Notestein. I'm an assistant U.S. attorney in Baltimore. I was the trial counsel in this case along with Mr. Proctor. On the issue we've just been discussing, I wanted to just be kind of clear on the actual sequence of events that led to Judge Quarles stepping off the bench. You were there when you saw the judge said, I'm going to leave, and that's kind of usual? How does that all work? Well, Your Honor, I was a little surprised, to be very honest. Why didn't you object? I didn't see the need to object, Your Honor. The jury was reviewing a piece of already admitted evidence. But why didn't you object and we wouldn't have this? In hindsight, Your Honor? If the defense lawyer is not going to object, I think the prosecutor has a responsibility to make sure the trial is conducted properly. You're correct. And trials like this, criminal trials in federal court, ought to be conducted before a judge. That is true, Your Honor. However, this was not part of the trial. It was part of the trial. You're not going to get away with that with me. I mean, it's part of the trial. Your Honor, in hindsight… It's in the courtroom and it's in the course of the trial. The jury deliberations are in the course of the trial. That is correct, Your Honor. It's important in the course of the trial. Absolutely. In hindsight, I certainly wish I had said something. I wouldn't have this issue right now. However, the court had already ruled on the jury's ability to review this piece of already admitted evidence. In fact, if you look at the record, I noted exactly how long that segment would be. It was an hour and seven minutes. And frankly, I was noting that for the judge in hopes the jury didn't want to watch an hour and seven minutes, but they did. Did they have taken this back in the jury room with them? That was something we actually discussed afterwards as well. We have previously given the jury a preloaded laptop with only video that's been admitted. We didn't do that in this case simply because we didn't really know what the request was until we got there and hadn't anticipated their desire to watch the interview again. But that's why we reviewed it in court and not had the jury do it back in deliberation. But you could have. There's nothing that would have prevented that evidence from being viewed by the jury. That's correct, Your Honor. And I did want to point that out that while, yes, this is part of the trial, typically the jury's review of evidence is something done without a judge or even the counsel present. So if that's something we could have done, the jury would have… But it's in the courtroom. That's correct, Your Honor. But there was no decisions being made at the time, unlike in the Riley case where the law clerk was deciding what portions of the testimony group… I'm not sure I understand your statement. It's not typical to have them re-review it inside of a courtroom without counsel or the judge present. No, that's correct, Your Honor. It's not typical to take it back if they want something additional and both sides agree to allow them to view it. That's correct, Your Honor. I think my point was simply this was not a contested portion of the trial where the counsel was going back and forth during closing argument, as in the Love and Pleasance case. This was the jury just simply reviewing a piece of already admitted evidence. I would note that the judge… This is the most damning piece of evidence because she's making all but a confession on it. Well, I want to take a bit of an issue with that, Your Honor, as well. I don't believe this was the most damning piece of evidence. Ms. Brown did not confess in these videos. She maintained her innocence just as she did when she took the stand. …potential for being very incriminating because you wanted it in the evidence and the jury wanted to hear it at a crucial time in the case when they're trying to decide whether the convictor on these counts could lead to life imprisonment, involving a murder in a drug conspiracy. Absolutely, Your Honor. It was incriminating evidence. You have to consider as well that on top of this interview where she denied all the allegations, she took the stand and made those same denials. In addition to that, there's testimony from 12 co-conspirators including Peter Blake, who testified that she was the one who ordered him to do the murder. Hubert Downer testified that she was the one that paid them to do the murder. Dean Meyrie testified he was present when she ordered the murder. These are all co-conspirators who were implicated in it themselves and were subject to substantial impeachment. They certainly were, Your Honor. However, I point out as well that Clive… And then you put on her statements to corroborate them. And the jury was listening to statements that were going to corroborate these co-conspirators about her involvement in the murder. Absolutely, Your Honor. I don't deny it was incriminating. That's pretty incriminating. It was incriminating, but I think it's important to consider there was a significant amount of additional evidence, including, for example, the testimony of Clive White, who was not a co-conspirator, was simply someone that Ms. Brown knew and was basically testified that she admitted the drug trafficking and the murder of Michael Knight to him. He was not subject to the same impeachment because he was not a co-conspirator. But just to make clear, just on the timing, the jury asked to review this portion of the interview. It had already been—this portion had been admitted. When Mr. Proctor references we weren't playing everything, we didn't play the entire 11 hours of interview. We played portions, but we clearly marked which portions were admitted. Now, the portions that were played in this jury deliberation incident were only what had already been played during the course of the trial. That's correct, Your Honor. Wasn't anything additional? Nothing additional. In fact, if you note on the joint appendix at 1934, I note that in the DVD it's going to be an hour and seven minutes, and in fact an hour and seven minutes is what was played. So Judge knew—that was before Judge Quarles left. He knew what was going to be played. Who was controlling the playing? I hit play in the— Pardon? I hit the play button, and it just played. You hit the play button? Yes, sir. So the prosecutor controls what's being played while the judge is absent? I was not—not while the judge was absent, Your Honor. If you see, Judge Quarles says he's going to leave. We resume playing. Judge Quarles leaves, and nothing happens until the video ends. And then, frankly, as Mr. Proctor said, we just sat there. Okay. So the prosecutor controlled the playing. It wasn't the clerk. That's correct, Your Honor. I figured it was the clerk. No, Your Honor. I was actually playing it off my laptop, basically. And on that point, the clerk, I just want to note, and I think the court has already brought this out, but in the Love and Pleasance case, which are squarely on point here, what makes them different from— What are they called? Love and Pleasance. Those are the two cases on point we cite in our papers. I know that— On point for what proposition? On this proposition that there is essentially the—I'm sorry, the plain error review, and that you do look at whether or not there is harm in this case. In those cases, the judge was absent during closing argument, and they found no structural error. They're the ones, the Seventh Circuit, the Ninth Circuit, no structural error. No, sir. Those are Fourth Circuit cases. Those are the Fourth Circuit cases. Correct. The Ninth Circuit cases— The Fourth Circuit cases that no structural error, reviewable for plain error. Exactly, Your Honor. That's exactly correct. All right, and if it's reviewed for plain error, where does it fail? There is no harm here. You say it's not plain error. Which prong does it fail on? Well, Your Honor, I think I— Walk away. Walk me through it. I would say that in the first, Your Honor, the Fourth Circuit has clearly said they don't condone a judge's absence. So as you're saying, the judge should have been there, but there simply is no harm here to Ms. Brown. There's nothing— So you concede the first two prongs of plain error review and plant your feet on the third? Yes, Your Honor. And I would say simply— If you get past the third, do you concede the fourth? No, Your Honor. I think that simply there is just no—even if there's error, there's just no harm here whatsoever to Ms. Brown. It doesn't affect her rights. The harm is the third. Correct. The fourth is integrity of the judicial proceedings. And I think that— You don't think it affects integrity of judicial proceedings? I don't think— It's part of the trial to be conducted, but the judge absent. I don't think in this case it does, Your Honor. Simply that you look at a case where it did, like in Riley. In that case, a law clerk was standing in as a judge. And no disrespect to law clerks, I was one myself, but I certainly shouldn't be presiding over a party's arguments and party's objections. It's just not— My understanding of structural errors would be deprivation of right to counsel, unlawful exclusion of grand jurors of the defendant's race, denial of self-representation, right to a public trial, failing to charge a jury on proof beyond a reasonable doubt, those kinds of things are structural errors. In this context, Your Honor, the courts that have found structural error have found that where a court abdicates its role in the adversarial process, that can also be structural error. And that's why in Riley, where it wasn't that the judge said, I'll be off the bench and this needs to go on. The judge couldn't be found. I mean, he was out to lunch, we presume. There's no evidence in that case as to where— That's the case where the law clerk presided? That's correct. And so that's where the judge abdicated his role. What circuit did that come from? That was the Ninth Circuit, Your Honor. That's right. We had that already. Correct. That's where the judge abdicated his role. What are you going to do next time? Next time, Your Honor, I would ask the judge to remain. I absolutely would. So you would object? Yes, Your Honor. I absolutely would. But I don't think that in this case that it rises to a level that the case needs to be— Can we change subjects now? I think we've beat that horse to death. Yes, Your Honor. How about the verdict form on 1,000 kilograms and 2,200 pounds? Your Honor, on the verdict form, the verdict form said there were three options in the special verdict form. Less than 100 kilograms, 100 kilograms to less than 1,000, and 1,000 kilograms or more of marijuana. And there was a parenthetical simply for the jury's understanding, a basis of reference that said 2,200 pounds. That's as only as on the 1,000 or more? Yes. Only parenthetical, no parenthetical on the other? Correct, Your Honor. 2,000? 2,200. 2,200 pounds? Pounds. And was there any evidence of kilograms? There was not discussion of kilograms during the trial. There was no evidence during the—how long did the trial last? The trial was, I believe, went through two weeks, Your Honor, approximately five or six trial days. 2,200 pounds. So the evidence was all in pounds. Yes. Was there an expert put on there to explain the difference between a pound and a kilogram? There was not, Your Honor, and that's what we realized at the end. But I would say regarding the trial evidence— Was there an instruction offered by either side on how you convert a pound to a kilogram? There was not, Your Honor. But the trial evidence was—I think this is important to consider. It was not that there was around 1,000 kilograms or around 2,200 pounds. We're talking about the evidence. I am because I think it's— What we want to talk about, I think—what I'd like to talk about is what the verdict was. Correct. And the verdict was 1,000 or more kilograms per end, 2,000 pounds. 2,200 pounds, correct. 2,200 pounds. 2,200 pounds converts to how many kilograms? I believe Mr. Proctor has it in his papers as about 997 kilograms. You agree with that? I don't have reason to say that that's incorrect, Your Honor. Could you agree with it or not? I mean, you've had, what, a year to figure it out? Correct. I believe he's right, Your Honor, yes. Pardon? I believe he's right. 997 kilograms is what the 2,200 pounds is. I believe so, Your Honor. However, I believe what the jury found was 1,000 kilograms. That was what that mark on the verdict sheet said. Well, they found 1,000 or more, and they found 2,200 pounds. On the basis of what you've said, it looks to me like they found both. They found them both. The troubling thing to me is you talk about pounds throughout the entire trial. You don't talk about kilograms. And you spring the kilogram thing on the verdict form, but you also put the pounds over there. Now, I know there's a case law that says that you can do that to help the jury understand what, in pounds, what a kilogram is. They didn't hear anything about kilograms. And, Your Honor, you're correct. And, frankly, I've tried many drug cases, and I've always had some reference in there to explain that 28 grams is an ounce, and that 1,000, or I'm sorry, a kilogram is 2.2 pounds or thereabouts. Wasn't there an instruction about 2.2 pounds? There was a discussion of 2.2 pounds. There was a discussion, and then there was, in the jury, I believe the jury instructions included, that was the first discussion on the record about it, was the judge saying that you have to find that the conspiracy involved 1,000 more kilograms. I'm telling you that 1,000 kilograms is 2,200 pounds. Okay. And you admit that was error? It is not a correct conversion, yes, Your Honor. Well, do you admit that it was error? Well, Your Honor, here's the thing. What Judge Quarles said was that- No, that's a simple question. I mean, it's a yes or no, and the next question is, was it preserved? Okay. I will say it's not error in this regard, Your Honor. You say it's not error. Not error. You say that 1 kilogram is 2.2 pounds. If you take it out to the thousandth digit, there are more precise numbers. 1 kilogram is not 2.2 pounds. It depends on the rounding, I say, Your Honor. You just told me it was 997 kilograms. When you take it out further, it certainly is there is more of an error at that point. I would say even if there is error, though, Your Honor, I don't believe it was preserved. When the verdict sheet was shown- So if there's error, it's subject to plain error review. That's what I'm getting at. Absolutely. And the reason it was not preserved is that when the verdict form was shown to counsel and was asked if there were any objections, no objection was raised regarding that. So evidentially, how many pounds did you prove? We proved tens of thousands of pounds, if not hundreds of thousands of pounds. The evidence was in this case that the drug conspiracy, the marijuana trucking ring that Ms. Brown was leading, was shipping a ton of marijuana. So we've got another unit there. But it was shipping 2,000 or more pounds of marijuana once or twice a month for 5 to 10 years. So we're talking thousands and thousands of pounds. And that's why I mentioned in my papers, if you look at the closing argument, the arguments here were not whether or not the predicate amounts were met. It was simply whether or not Ms. Brown was a member of the conspiracy because it was so clear from the testimony. As people testified about tractor trailers loaded with marijuana being brought month after month after month, and this woman clearing probably a million dollars a month from the sale of that marijuana, that that wasn't the question. It simply wasn't the concern. So that's why I say it's important to consider that's the evidence the jury heard. And their finding of, I don't think there's space for their finding to be between or would be evidence to support a finding of that area between 1,000 kilograms and 220 pounds. As I said, the evidence was simply much more large. That's why I think there was an issue. The evidence was, but we're talking about the jury verdict. Correct. We've got some cases around here. If the government or the grand jury indicts somebody for distributing or conspiring to distribute marijuana, cocaine, and heroin, and they don't, and the jury is asked to render a verdict, just a general verdict. You're not asked which drug was, they just issue, they render the general verdict. And then the issue comes up, well, what's the penalty? Right. Because there's a different penalty for conspiring to distribute heroin from conspiring to distribute marijuana. Absolutely. And I think we have said, and the Supreme Court said, that there's an ambiguity in it, and you've got to give the ambiguity to the defendant. Well, I think, Your Honor, there is not an ambiguity. Whereas that, there would be a clear one. If you haven't alleged predicate amounts and you haven't gotten a clear verdict form, and I've had cases just like that, and we have a very detailed verdict form for each count for each drug. That's what you had. Right, that's what you had. But here you didn't, if you'd had the right amount of pounds. Well, Your Honor, I think we did have the correct on the kilograms, and I think that it's best understood to say that in this case. If you hadn't, maybe you hadn't put the pounds on there, you might have been able to. At this point, Your Honor, I. All your evidence was in pounds, so you're trying to explain it, and then you explain it wrong. Correct. But I think it's important to hear is that they did find pounds. So if you had 997, if she's convicted of 997. Kilograms. That alters the permissible penalty on that one count to up to 40 years, correct? That's correct. Rather than up to life. Correct. And then a couple of other counts she got convicted were already up to life. Correct. She got on counts three and four. So does it make any difference? It doesn't, Your Honor. So you're back to saying that, well. If we get there, but. It might have been a, so a life sentence is just so what? I mean, it did make, she got so many life sentences, it did make a difference. Well, no, Your Honor. I think what makes it different from other cases is that in this, well, we're, I don't think there was an error in that the jury did find 1,000 kilograms. That is the box. So what if it is? Excuse me, Your Honor? So what if it is an error? Well, I think in this case there is an error. There are life sentences. Excuse me? Aren't there two other life sentences? That's correct. So what? Well, I think that in that case, this, it wouldn't change the ultimate sentence. So why are you arguing? Excuse me? I'm not, I'm missing something here. No, Your Honor, I agree. I think that there is. I mean, if there's error, and the sentence is not going to change, and even if you concede, so to speak, well, 40 years would be it. So what? Your Honor, Ms. Brown, she'll go to jail for the same amount of time. I, you know, frankly, I think that in the end it doesn't change your ultimate sentence. I just, in this case, I don't think that there, the court committed an error. She said she should have gotten only two life sentences instead of three. Or is that what it was, two and three? It would be two. If she didn't get life on count one, she would have two other life sentences. Two other. 40 years on count. So she should have a 40 years, well, the judge could give her less than 40 if he wanted to. If it were to go back, yes. Although the court did indicate. But she'd still have two life sentences. Correct. And, I mean, how much sort of carelessness can we tolerate up here in the Fourth Circuit in conduct of these, of trials like this? I mean, when the judge leaves the courtroom and the verdict form doesn't conform to the law. Well, Your Honor, I think the verdict form did conform to the law. But you want us to find it, well, they can haul in tons around and around anyway. But maybe the jury would have found that. Probably would have. But they usually, that's up to the jury what they want to find. We can't say what the jury, or maybe we can. But why should we do the work for you? Respectfully, Judge King, we're not asking, I think, the court to just throw its hands up and say it doesn't really matter, she's going to jail forever. I think the important to consider on the jury verdict issue is that the jury did find 1,000 kilograms. They did check that box. It wasn't simply an error. The amount that they found out in the parentheses is less than that. So if there's an ambiguity, why wouldn't the defendant get the benefit of the ambiguity? I don't believe there is an ambiguity, Your Honor. Well, there's a difference between 2,000 pounds and 1,000 kilos, 2,200 pounds and 1,000 kilos. One of them is not 1,000 kilos, which the statute says it has to be the 1,000 kilos to be eligible for the license. It has to be the 1,000 kilos. 2,200 pounds doesn't cut it. I believe the 2,200 pounds was only there to explain it to the jury for a point of reference. But it explains it wrong. It's not exactly accurate, Your Honor, no. That's correct. However, I do believe that the jury's finding was 1,000 kilograms. They tried to, they almost objected. Maybe they did. They said, we don't, we really hope we don't get another 2,255 over this. We hope, we'd like for it to get a correct statement of law, but nobody bothered to go look. I mean, if you had one of those iPads in the courtroom, you could have looked up the formula. That's correct, Your Honor. I think that the reason— I mean, everybody's sitting around the courtroom, and nobody bothered to look it up. I think the reason for that was, Your Honor, I think that everyone there understood it was simply for a point of reference for everyone to understand that that's about what— All the evidence was pounds. Every bit of it was pounds. That's correct. There's no kilos that's ever been mentioned in the course of two weeks. Correct, but as I said— Nobody ever told the jury what a kilo was. That's correct. But as I was saying before, the evidence not only had been—it had been in pounds, but it had been in such large amounts of pounds that— I may sound cranky here today because it's the last day of court. It's been a long week, and I apologize to all of you if I do. Go ahead, sir. Not a problem, Your Honor. I see my time has expired, so if there are no other questions, I will submit. We appreciate it. Thank you, Your Honor. Thank you very much. Mr. Proctor. Judge. Judges, I'll be very brief. The one—a couple of points I want to hit. The first one is I don't want to see an opinion saying I failed to preserve another error after the first part of our discussion. So 1692 and 1693 are the pages of the joint appendix. The government at the charge conference proposes let's tell the jury that 1,000 kilograms equals 2,200 pounds because the testimony has been in English units. And I said I don't want some 2255 lawyer saying it was 2,200 point, and Judge Quarles says 1 kilo is 2.2 pounds. And I say exactly. There isn't a few answers either way. And he says exactly. I think that's the one. And he was wrong. And I say— You were wrong. If that's a correct statement of law, we have nothing additional. I didn't back down. I didn't withdraw the objection. Why didn't you tell him it was not a correct statement? I don't know off the top of my head. Well, you could look it up. I didn't propose the instruction. If I proposed it, it's on me. The government says let's— You should have objected to the instruction. You should have objected to it before the jury started to deliberate, after it was given. Under the rule, you're supposed to object after the instruction is given. You give it a last chance and tell the judge what's wrong with it. All you had to say was I've looked up this thing, and that's not—2,200 pounds is not 1,000 kilograms. Well, again, the government's the one that proposed it. The judge said it's a correct statement of law. I said I have nothing additional. That's not waiver. And the second point— But you say it's harmless air review. I say that it's harmless air review. Correct. You're saying it's preserved. I say it's preserved. And that's not—correct. I say it's preserved. And the second point I wanted to make, when the government's talking about it's in the parenthetical and, you know, it's a guide to the jury because that's what the testimony was, when the verdict is read, this is page 1947 of the—1946 and 1947, we find the defendant guilty of marijuana, the clerk, and what amount of marijuana was involved, jury foreperson, 2,200 pounds. That's what the jury foreperson said when she read the verdict. She didn't say 1,000 kilograms. I sort of gleaned that the fact that you didn't really get into this at the beginning was because you felt at the end of the day it wasn't going to make one bit of difference. It's not. And you spent your time on something that would make a difference for your client. Bingo. You can win all you want to on this, but she's going to have two life sentences at the end of this deal, and the government can concede it. So that's kind of why I gleaned you went after that first one because that might make a difference for your client. You're right, sir. She's not interested in your theories up here and what all that means. And that's why I'm just spending a couple of minutes at the end of the day when our eyes are starting to glaze over just to point out it was preserved. The verdict was 2,200 pounds, which is 997 kilos. If it goes back, what happens? Oh, the judge finds if the amount had been less than 1,000, he would have imposed a 40-year sentence. That's in the sentencing transcript. But what would happen? It doesn't go back. What would be the business? Well, what effect would it have? You'd get another sentencing order. No. You wouldn't? Why wouldn't you? Because Judge Quarles said—  No, you wouldn't actually, sir. May I explain just briefly? Well, you don't enter sentencing orders. No. Judge Quarles at the sentencing said the sentence for count one is life. However, if I have erred and the statutory maximum was 40, I would impose a sentence of 40 years. Well, it needs to enter an order to that effect. If you're right, we'd have to send it back. But if we did that, what good would that do for your client? Not one. It would just uphold Apprendi and Allain and those kind of things. It wouldn't do any good. It would make it lawful. It would make it lawful. Rather than unlawful. Correct. You should say, I would think, that affects the integrity of the judicial proceedings, that a sentence of life or 40 years, either one ought to be lawful. And I'm happy to claim credit for your statement, sir, yes. Thank you. Thank you, Mr. Proctor. And we particularly thank you for all the work you've done in this case. The trial, too big trial in this appeal, and it hadn't been easy. And we appreciate it. And we couldn't make it without lawyers like you. Thank you. Appreciate it. We'll come down and Greek Council, well, adjourn court, sign a die, and then we'll come down to Greek Council. This honorable court stands adjourned, sign a die. God save the United States and this honorable court.
judges: Robert B. King, James A. Wynn, Jr., Henry F. Floyd